IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ROCHETTA C. | : |
| v. | : NO. 25-CV-201 |
| FRANK BISIGNANO,<br>Commissioner of Social Security | : |

**O P I N I O N**

SCOTT W. REID                                                                     DATE:  September 25, 2025
UNITED STATES MAGISTRATE JUDGE

Rochetta C. brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB").  She has filed a Request for Review to which the Commissioner has responded.  As explained below, I conclude that the Request for Review should be denied and judgment granted in favor of the Agency.

I.     *Factual and Procedural Background*

Rochetta C. was born on June 15, 1978.  Record at 212.  She completed high school.  Record at 262.  She worked in the past as an administrative assistant for a law firm.  Record at 263.  On June 17, 2022, Rochetta C. filed an application for DIB, alleging disability as of November 10, 2020, on the basis of cervical and lumbar spine impairments, sciatica, right knee pain, pseudotumor cerebri (otherwise known as idiopathic intercranial hypertension, or "IIH"), anxiety and depression.  Record at 212, 261.

Rochetta C.'s application for benefits was denied initially on September 15, 2022, and upon reconsideration on April 14, 2023.  Record at 107, 121.  She then sought review *de novo* by an Administrative Law Judge ("ALJ").  Record at 149.

A hearing before an ALJ was held on January 30, 2024.  Record at 56.  On April 10, 2024, however, the ALJ issued a written decision denying benefits.  Record at 18.  On December 12, 2024, the Appeals Council denied Rochetta C.'s request for review, permitting the ALJ's decision to stand as the final decision of the Commissioner for Social Security.  Record at 1.  Rochetta C. then filed this action.

II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985).  Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision.  *Richardson v. Perales*, *supra*, at 401.  A reviewing court must also ensure that the ALJ applied the proper legal standards.  *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  42 U.S.C. §423(d)(1).  Each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.  (ii)  At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.  (iii)  At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record. *Id*. The RFC assessment reflects the most an individual can still do, despite any limitations. SSR 96-8p.

The final two steps of the sequential evaluation then follow:

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make the adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.    *The ALJ's Decision and the Claimant's Request for Review*

In her decision, the ALJ determined that Rochetta C. suffered from the severe impairments of idiopathic intercranial hypertension (IIH)/pseudotumor cerebri, empty sella, obesity, degenerative disc disease, major depressive disorder, bipolar disorder, an anxiety disorder, post-traumatic stress disorder, and cannabis abuse. Record at 21. She found, however, that none of the impairments and no combination of impairments met or medically equaled the severity of a listed impairment. Record at 22.

The ALJ determined that Rochetta C. retained the RFC to perform a limited range of light work, lifting 20 pounds occasionally and 10 pounds frequently, with unlimited sitting, but with standing and walking limited to four hours total throughout the workday; she could occasionally balance, stoop, kneel, crouch, climb ramps and stairs, but never ladders, ropes or scaffolds; she could never crawl; she was limited to occasional exposure to extreme heat, with no excessive loud noise, and only occasional use of computer screens or monitors; and was able to do "simple,

3

routine tasks but no complex tasks in low stress work environment, defined as occasional decision making and occasional changes in work setting." Record at 27.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ found that Rochetta C. could work in such jobs as an assembler of electrical accessories, or a ticket seller. Record at 42. She decided, therefore, that Rochetta C. was not disabled. Record at 42-3.

In her request for review, Rochetta C. argues that the ALJ improperly weighed the medical opinion evidence from her treating practitioners, particularly her physiatrist, James Kim, D.O., and her psychiatrist Laura Gonzalez, M.D., (wrongly identified throughout by both sides as Lora Fleysher, L.C.S.W., to whom Dr. Gonzalez's report was addressed). She also argues that the ALJ wrongly weighed her subjective testimony.

IV.     *Discussion*

    A.     *The Medical Opinion Evidence*

        1.     *Dr. Kim*

James Kim, D.O., is an expert in physical medicine and rehabilitation. *Request for Review*, at 5, n. 12. He saw Rochetta C. for the first time on March 3, 2022, for a "physical medicine rehabilitation consultation." Record at 411. Dr. Kim noted at that appointment that he did not have the results of an earlier MRI of Rochetta C.'s lumbar spine. Record at 410. He wrote that Rochetta C. had "not been able to work since 2018 primarily because of her pseudotumor cerebri symptoms," noting "patient is losing vision." Record at 411. He wrote: "At this point she still remains disabled." Record at 413.

A week later, on March 10, 2022, Dr. Kim completed a Multiple Impairment Questionnaire for Rochetta C.'s application for disability benefits. Record at 404, 408. Although he had only seen her once, he indicated that Rochetta C.'s impairments were expected to last at least twelve months, and that she was not a malingerer. Record at 404.

In the questionnaire, Dr. Kim described Rochetta C.'s primary symptoms as headaches and low back pain, aggravated by lifting, bending, and twisting. Record at 405. He indicated that she could perform a job in a seated position for two hours in an eight-hour workday, and stand for one hour. Record at 406. This would preclude full-time work. She could lift and carry no more than ten pounds, occasionally. *Id*. She could use her hands only occasionally for reaching overhead, and for grasping, turning, or twisting objects. Record at 407.

According to Dr. Kim, Rochetta C.'s symptoms would frequently be severe enough to interfere with her attention and concentration. Record at 407. She would need to take "unscheduled breaks to rest at unpredictable intervals" during a workday, and would be absent as result of her impairments or treatment more than three times per month. Record at 407-8. These limitations, too, would be work preclusive. Dr. Kim also opined that Rochetta C.'s symptoms and limitations as described dated as far back as 2018. Record at 408.

The ALJ gave no weight to Dr. Kim's March 3, 2022, finding that Rochetta C. "remained disabled." Record at 38. Nor did she credit his findings in the Multiple Impairment Questionnaire as to Rochetta C.'s limitations. Record at 39. She explained:

> The undersigned finds this opinion unpersuasive because it is not consistent with the doctor's treatment records, specifically at that time considering Dr. Kim only evaluated the claimant initially on March 3, 2022, he had no diagnostic imaging to review, and his indication that the claimant's limitations would apply as far back as 2018 appears to be based upon the claimant's self-reporting that she had been unable to work since 2018 primarily because of her pseudotumor cerebri symptoms.

*Id*.

The ALJ also noted that the severe limitations that Dr. Kim found in the Questionnaire were inconsistent with his own physical examination of Rochetta C., which was primarily normal. Record at 39. Indeed, in his March 3, 2022, treatment note, Dr. Kim indicated that Rochelle C. was normal regarding her mental status and "cranial nerves," and that she had normal muscle bulk and tone, and 5/5 strength in all four extremities, although tenderness and spasms were found in the cervical and lumbar regions of her spine, and in her right knee. Record at 411-412. Her reflexes and sensory examination were normal, and her "finger to nose" testing was intact. Record at 412. As to gait, Dr. Kim wrote that Rochetta C. "ambulates independently without assistive device." *Id*. Two later appointments yielded the same examination results. Record at 520-21 (April 25, 2022); 525-6 (July 27, 2022).

The ALJ then wrote that Dr. Kim's findings were inconsistent with an MRI of Rochetta C.'s lumbar spine performed on June 24, 2022. Record at 39, *citing* Record at 508-9. The MRI showed sacralization of the disc at L5, but normal alignment and lordosis, with no stenosis anywhere, and "interspaces relatively well-hydrated and with normal height," with the exception of L5-S1. Record at 509. Dr. Kim described the MRI as "negative for any pathology of the lumbar spine." Record at 524. A March 17, 2022, x-ray of the right knee showed no abnormality. Record at 512. The ALJ noted this, as well. Record at 39. The record does not include a scan of Rochetta C.'s cervical spine.

Rochetta C. accuses the ALJ of inappropriately "playing doctor" by deciding what the impact of these medical findings should have been on Dr. Kim's opinion. However, the Social Security regulations specifically require an ALJ to determine the extent to which a medical opinion is supported by the practitioner's records, and the extent to which it is consistent with medical and non-medical sources. 20 C.F.R. § 404.1520c(c)(1) and (2).

Therefore, the ALJ was not only permitted, but required, to observe that Dr. Kim's opinions as set forth in the Questionnaire were unsupported by the physical examination results. The ALJ was also required to observe that Dr. Kim's findings were inconsistent with the results of objective testing he ordered, but which had not even taken place before he completed the Questionnaire. There is no later objective testing in the record.

It could also be noted that the length of a treatment relationship, and its purpose, remain relevant to assessing the persuasiveness of a medical opinion. 20 C.F.R. § 404.1520c(c)(3)(i) and (iii). At the time Dr. Kim completed the Questionnaire, the length of his treatment relationship with Rochetta C. was minimal. Further, since Dr. Kim treated Rochetta C. only for physical medicine and rehabilitation, to the extent that the limitations he imposed were based on her headaches and other symptoms of pseudotumor cerebri, it is not clear that he had relevant experience: "The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s)." 22 C.F.R. §404.1520c(c)(3)(iii).

Regarding the pseudotumor cerebri/IIH, Rochetta C.'s treating neurologist, Jonathan Cheponis, M.D., also completed a Multiple Impairment Questionnaire after seeing her only once, on January 30, 2023. Record at 619. He confirmed that she suffered from IHH, and that it caused "vision issues, headaches" and "whooshing tinnitus." Record at 620. However, he specifically declined to assess how this would affect Rochetta C.'s ability to perform work-related functions, other than to opine that her symptoms would not increase if she was "placed in a competitive work environment," and that she would not need "unscheduled breaks at unpredictable intervals." Record at 621-2. This contradicts Dr. Kim's opinions.

7

The ALJ found Dr. Cheponis's report persuasive, except to the extent that it may have suggested that she had no functional limitations (in fact, Dr. Cheponis specified that functional limitations were "not assessed"). Record at 39, 621-2.

Rochetta C.'s treating ophthalmologist, David J. Axe, M.D., wrote in a letter dated January 29, 2024, that she suffered from IIH as far back as 2016, as confirmed by two MRI studies of the brain. Record at 698. She underwent periodic lumbar punctures to reduce her persistently high intercranial pressure. However, at her most recent visit, "her visual acuity with correction was 20/20-1 in the right eye and 20/20 in the left eye," although with bilateral edema. *Id*. This directly opposes Dr. Kim's statement that Rochetta C. was actively "losing vision," although that is a risk of uncontrolled IIH. Record at 411, 656 (re potential vision loss).

Finally, the ALJ was entitled to rely upon the opinions of the non-examining agency medical experts who reviewed Rochetta C.'s medical records and determined that she was able to perform a range of work at the light exertional level. Record at 36; 114-15 (Floyretta Pinkard, M.D., upon initial review); 127-8 (Charles Hubbard, M.D., upon reconsideration).

Thus, the ALJ acknowledged that Rochetta C. suffered from the severe impairments of IHH/pseudotumor cerebri, which caused her headaches and other symptoms. She specifically limited the time Rochetta C. could be exposed to screens and monitors, because she testified that these brought on visual disturbances, nausea and headaches. Record at 27, 33, 64-5 (Testimony). She also found that Rochetta C. suffered from degenerative disc disease, and she limited her functional abilities accordingly in the RFC assessment. However, the ALJ's conclusion that Dr. Kim's extreme opinions were not persuasive was thoroughly explained, and well-supported by substantial evidence. There is no basis for relief in this regard.

2. *Dr. Gonzalez*

Drs. Susan I. Lourido, M.D., and Laura Gonzalez, M.D., signed a Psychiatric/Psychological Impairment Questionnaire dated September 14, 2021.[1] Record at 357. Dr. Gonzalez listed Rochetta C.'s diagnoses as major depression disorder, general anxiety disorder, and post-traumatic stress syndrome disorder. Record at 357. She identified many symptoms, including depressed mood, anxiety, feelings of guilty or worthlessness, hostility or irritability, suicidal ideation in the past, anhedonia, appetite disturbances, decreased energy, maladaptive patterns of behavior, impulsive or damaging behavior, social withdrawal or isolation, difficulty thinking or concentrating, easy distractibility, poor memory, excessive sleep, recurrent panic attacks, and intrusive recollections of a traumatic experience. Record at 358.

Dr. Gonzalez indicated that Rochetta C. was markedly limited in the ability to maintain attention and concentration for extended periods, perform activities within a schedule and consistently be punctual, complete a workday without interruptions from psychological symptoms, and to accept instructions and respond appropriately to criticism from supervisors. Record at 360. She was moderately-to-markedly limited in other areas, and moderately limited in still others. *Id*. She had "none or mild" limitations only in the ability to understand, remember, and carry out one to two-step directions, maintain appropriate behavior, adhere to basic standards of neatness, respond appropriately to workplace changes, and to be aware of hazards and take appropriate precautions. *Id*.

---

[1] Counsel addressed the Questionnaire to Lora Fleysher, LMSW, so that her name appears at the top of the form, and for that reason both counsel for Rochetta C. and for the Agency, as well as the ALJ, described Ms. Fleysher as the author of the Questionnaire. However, it was signed only by Drs. Gonzalez, and Lourido. Record at 361. It appears that Ms. Fleysher was Rochetta C.'s therapist. Record at 399. Prior counsel for Rochetta C. identified Dr. Gonzalez as Rochetta C.'s treating psychiatrist. Record at 341.

According to Dr. Gonzalez, Rochetta C. would be absent from work as a result of her impairments or treatment more than three times per month. Record at 361. It is not clear how much this would be caused by her mental limitations, and how much by the "severe headache daily" Dr. Gonzales also noted as a work-related limitation. *Id*.

The ALJ did not find Dr. Gonzalez's opinions persuasive. Record at 37. She first pointed out that they were not supported by any treatment records or clinical findings. *Id*. She then wrote: "Furthermore, [Dr. Gonzalez]'s opinions are not consistent with the overall records reflecting no more than medication prescribed by her primary care provider, which was effective at treating her anxiety, and the claimant's consistent denials of any psychiatric symptoms … ."

Indeed, the record does not reflect any treatment from a mental health practitioner other than one telehealth appointment with Ms. Fleysher which took place on January 4, 2022. Record at 399. There, Rochetta C. was described as upset and rambling, and with preoccupied thought content. *Id*. She discussed her troubled relationship with her mother and brother. *Id*. The only other note in the record from Ms. Fleysher is dated March 7, 2022, and reflects a termination of services because of Rochetta C.'s re-location from New York to Pennsylvania. Record at 401. There, Ms. Fleysher wrote: "You informed me that your PMD [primary care doctor] is refilling your psychiatric medications and you are looking for a therapist in PA." *Id*.

Nevertheless, there are no mental health treatment records from Pennsylvania. Rochetta C. told the ALJ at her hearing that she had some mental health therapy in 2023 through an app, but it became expensive and she discontinued it. Record at 73.

Further, as the ALJ noted, all of Rochetta C.'s records from her primary care practitioner describe her as psychologically normal. On August 26, 2021, Rochetta C. told Certified Physician's Assistant James Kincel that her anxiety was stable on Prozac, and that she had "less

10

stress in PA than she did in NY." Record at 430. She was described as positive for stress, but negative for dysphoric mood, anxiety and depression. Record at 431. On February 18, 2022, CPA Kincel reported that Rochetta C. had a "past medical history" of anxiety. Record at 772. Again, her mental health was described as "Negative for dysphoric mood, nervous/anxious and depression." *Id*. Her mood and affect were described as normal, and her mental status as "alert." Record at 773. A notation regarding anxiety stated "stable, continue medication." Record at 785. Similarly, on August 17, 2023, she was noted as negative for "nervous/anxious" and depression. Record at 844. Again, her mental status was said to be alert, and her mood and affect were described as normal. *Id*.

On September 6, 2022, Rochetta C. met with consulting mental health expert John Kajic, Psy.D. Record at 536. She told him of significant symptoms of anxiety, mania, and depression, as well as insomnia, disordered eating, and compulsive behavior. Record at 537-8. Nevertheless, Dr. Kajic described her as cooperative, and found her manner of relating, social skills, and overall presentation to be adequate. Record at 538. Her speech was intelligible and fluent, and her thought processes coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia. *Id*. Her affect was full and appropriate. Record at 539. She was fully oriented, with intact attention and concentration, an intact memory, average intellectual functioning and clear sensorium, although her mood was depressed and anxious. Record at 540. Her insight and judgment were said to be only fair, however. *Id*. She drove herself 48 miles to the appointment, unaccompanied. Record at 536.

According to Dr. Kajic, Rochetta C. was unlimited in the ability to understand and carry out both simple and complex instructions, and only mildly limited in her ability to make judgments, and to interact with the public, supervisors, and co-workers. Record at 541-2. She

was, however, moderately limited in the ability to respond appropriately to usual work situations, and to changes in the work setting. Record at 542. The ALJ found Dr. Kajic's findings "generally persuasive," although his diagnosis of a bipolar disorder "appear[ed] to be based heavily on the claimant's subjective complaints and self-reported diagnoses" which were not supported by her treatment records. Record at 38.

The ALJ also found "generally persuasive" the opinions of state agency mental consultants, Monica Yeager, Psy.D., and William Anzalone, Psy.D, who reviewed Rochetta C.'s records initially and upon reconsideration, respectively. Record at 36. Both assessed Rochetta C. with only mild limitations in the ability to understand, remember, or apply information; interact with others; and to adapt or manage herself, and a moderate limitation in the ability to concentrate, persist, or maintain pace. Record at 112, 125.

Rochetta C. argues that, since the ALJ credited the opinions of Drs. Yeager and Anzalone, she erred in failing to adopt their view that she could carry out only "very" short and simple instructions, and complete only "one and two-step tasks." Record at 118, 131. She argues that "the ALJ failed to explain why she had not found these limitations after her purported agreement with opinions that Plaintiff was so limited." Request for Review at 16.

In fact, the ALJ specifically discussed this exact issue:

> [A]s it pertains to the doctors' indication that the claimant is capable of performing one to two-step tasks, if it is an example, and not a limitation, it is consistent with and supported by the longitudinal record. However, if it is meant to be a limitation, it is not consistent with, or supported by the longitudinal record or the claimant's reported activities of daily living, which show that she engages in many multi-step tasks and activities, including performing personal care tasks, doing some cleaning, driving, reading, making some meals, doing laundry, ordering groceries, and managing her money.

Record at 37.

Moreover, the ALJ's decision not to adopt the one and two-step limitation, with only "very" short instructions, was entirely permissible, given the substantial evidence she cited. An ALJ is not required to adopt all of a medical source's opinion solely because she found the opinion as a whole to be persuasive. *Jeanne Marie G. v. Dudek*, Civ. A. No. 23-2038, 2025 WL 952477 at *7 (E.D. Pa. Mar. 27, 2025), *citing Wilkinson v. Comm. of Soc. Sec.*, 558 F. App'x 253, 256 (3d Cir. 2014); *Miller v. Dudek*, Civ. A. No. 24-731, 2025 WL 2021920 at *1, n. 1 (W.D. Pa. July 18, 2025) (Also citing *Wilkinson* and writing: "Concerning Miller's argument that it was error for the ALJ to not specifically include a one- and two-step tasks limitation in the RFC despite finding [Drs.] Young and Timchack's opinions persuasive, this Court has made it very clear that an ALJ is not bound to adopt all the opined limitations in an opinion merely because he or she finds the opinion persuasive").

As discussed above, the ALJ acknowledged that Rochetta C. suffered from psychiatric impairments. Record at 21. She accordingly limited Rochetta C. to "simple, routine tasks but no complex tasks in a low-stress work environment" which she defined as requiring only "occasional decision making or changes in work setting." Record at 27. However, substantial evidence supported the ALJ in concluding that Dr. Gonzalez's extreme findings were unsupported by her records, and inconsistent with other medical evidence. There is, therefore, no basis upon which this Court could interfere with her decision in this regard.

B.     *Rochetta C.'s Subjective Testimony*

Rochetta C. testified at her hearing that she suffered from daily headaches with nausea and vomiting, which required her to lie down for two to three hours each time.  Record at 63, 67.  She testified that she experienced snowy vision, which was worsening, as well as dizziness, which caused her to fall.  *Id*.  She also testified to stabbing pain in her back.  Record at 71.  She further said that she suffered from depression and anxiety, which cause her to be irritable and unable to concentrate.  Record at 72.

Using the system set forth in SSR 16-30, the ALJ found that Rochetta C.'s medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements as to the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent" with the objective medical evidence or her treatment history.  Record at 28-9.

Rochetta C. argues that the ALJ erred in finding that her statements were not supported by the objective medical evidence.  However, as discussed above, the only back MRI in the record was "negative for any pathology of the lumbar spine."  Record at 508-9, 524.  The March 17, 2022, x-ray of her right knee was also benign.  Record at 512.

As to Rochetta C.'s head MRIs, the ALJ did not deny that they showed abnormalities which her treating neurologists diagnosed as IIH/pseudotumor cerebri.  Record at 29, *and see* Record at 427.  On February 16, 2023, Rochetta C. had a lumbar puncture to remove fluid from her spine and release pressure in her cranium.  Record at 592-6.  Nevertheless, objective testing from Rochetta C.'s ophthalmologist repeatedly showed normal visual field testing and no significant changes on optic nerve testing.  Record at 29, *citing* 366, 368; *also see* Record at 698 (corrected vision of 20/20-1, 20/20).

Rochetta C. also faults the ALJ for calling her treatment "conservative" and "rather limited." Her attorney argues: "Ms. [C.]'s neurologists have not proposed surgery for her symptoms caused by IHH; indeed there may not be any safe surgical procedure available for her." *Request for Review* at 21. On the contrary, however, Dr. Cheponis wrote in a treatment note from January 30, 2023: "She has been offered shunts and other procedures in the past but wants to avoid them unless she has no other choice." Record at 600. Amiel Bethel, M.D., another neurologist, noted on April 4, 2024, a few days before the ALJ issued her decision, that Rochelle C. was "not interested in surgical intervention for her IIH." Record at 49. It was therefore reasonable for the ALJ to call her treatment conservative.

Notably, Dr. Cheponis also wrote in his January 30, 2023, note: "I referred her to bariatrics for a nutritionist and medical examination, as she understands that weight loss is ultimately the best treatment for this condition … ." Record at 600. In a note dated August 14, 2023, Dr. Cheponis wrote: "I gave her another referral to bariatrics … She knows that her vision may be permanently affected if we don't get her weight down and get the pressures under control." Record at 656. There is no evidence in the record that Rochetta C. ever pursued a bariatric surgery, although she sought a prescription for Wegovy from Dr. Bethel in 2024. Record at 49. In any event, at the time the ALJ issued her decision, Rochetta C. had not exercised a surgical or medication option to address her weight.

Rochetta C. makes the same argument as to her mental health treatment; that the ALJ erred in calling it conservative and limited because "it did not include psychiatric hospitalizations or other more intensive treatment." Request for Review at 20. She cites cases such as *Thomas v. Colvin*, Civ. A. No. 15-876, 2016 WL 4537065 at *3 (W.D. Pa. Aug. 30, 2016), where the court found that treatment consisting of psychotropic medicine and therapy was

15

"neither limited nor conservative," and *Huff v. Berryhill*, Civ. A. No 18-0006, 2018 WL 3546555 at *10 (M.D. Pa. July 24, 2016), in which the court similarly found that medication and counseling was not "conservative" treatment.

In this case, however, Rochetta C. did not have medication *and* counseling, like the plaintiffs in *Thomas* and *Huff*. She had no counseling at all within the relevant period. The *Huff* plaintiff "consistently sought treatment from mental health professionals during the relevant time period." 2018 WL 3546555 at *10. There is no record of Rochetta C. seeking a mental health referral from her primary care practitioner or elsewhere. Further, her medication consisted of a prescription from her primary care practitioner for Prozac. The *Thomas* plaintiff, on the other hand, not only participated in biweekly therapy, but took Depakote – an antipsychotic – and Xanax, which is a highly controlled antianxiety medicine. 2016 WL 4537065 at *3.

These facts, together with an absence of mental hospitalizations, partial hospitalizations, intense therapy schedules, or emergency room visits for psychiatric reasons, warrant the ALJ's description of Rochetta C.'s mental health treatment as "limited." Nor does the record contain evidence of non-medical events which are suggestive of psychiatric disturbance, such as police contact, conflict with neighbors or landlords, or abnormal behavior in her doctors' offices.

Thus, substantial evidence supports the ALJ in concluding that Rochetta C.'s description of the intensity, persistence, and limiting effects of her mental health impairments was not entirely consistent with the record. Accordingly, no relief is due on this claim.

V.    *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be DENIED, and judgment entered in favor of the Commissioner.

BY THE COURT:

*/s/ Scott W. Reid*

_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE